UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

OCT 17 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case Number: 06-438M |
| | : | Violations: |
| v. | : | 18 U.S.C. § 1018 |
| | : | (Making a False Writing) |
| | : | |
| | : | 18 U.S.C. §§ 208, 216(a)(1); |
| LESTER M. CRAWFORD | : | 5 C.F.R. § 2640.202(c) |
| Defendant | : | (Conflict of Interest) |

## STATEMENT OF OFFENSES

Pursuant to Fed. R. Crim. P. 11, defendant LESTER M. CRAWFORD ("CRAWFORD") and the United States agree and stipulate as follows:

### Introduction

At all times relevant to these offenses:

1. The United States Food and Drug Administration ("FDA") was the country's principal consumer protection and health agency, and regulated 25% of the gross domestic product, including the food supply, medical devices, drugs, vaccines, cosmetics, animal feed and drugs, and radiation-emitting items. The FDA issued and enforced regulations, authored policy recommendations, approved and recalled products, issued alerts to consumers, and took other actions.

2. Defendant LESTER M. CRAWFORD ("CRAWFORD") held the most senior positions in the FDA. CRAWFORD served as Deputy Commissioner from February 25, 2002 until March 26, 2004, when he became Acting Commissioner. On February 15, 2005, CRAWFORD was nominated to become Commissioner. On July 18, 2005, the United States

Senate confirmed CRAWFORD, who remained Commissioner until September 30, 2005.

3. CRAWFORD's office was located in the FDA's Parklawn Building, in Rockville, Maryland. As Acting Commissioner and then Commissioner, CRAWFORD also had an office in the FDA's Switzer Building, in Washington, D.C.

4. As a senior FDA employee, CRAWFORD was required to file regular Public Financial Disclosure Reports, known as Standard Form SF 278s ("SF 278s"). Schedule A of the SF 278 required the filer to list all investment assets having a value exceeding $1,000 that were held by the filer or the filer's spouse, as well as sources of income exceeding $200 earned by the filer during the applicable reporting period. Schedule B of the SF 278 required the filer to list all transactions in stocks and other securities in an amount exceeding $1,000 that were undertaken by the filer or the filer's spouse during the applicable reporting period.

5. There are three types of SF 278s: new entrant or nominee SF 278s, incumbent SF 278s, and termination SF 278s. For the new entrant/nominee SF 278, the reporting period for Schedule A is the previous calendar year through the date of filing; Schedule B is not applicable. For the incumbent SF 278, which must be filed annually, the reporting period for Schedules A and B is the previous calendar year. For the termination SF 278, the reporting period is the end of the previous reporting period through the date of termination.

6. In 2002, 2003, 2004, 2005, and 2006, CRAWFORD filed a total of six SF 278s: a 2002 new entrant SF 278, a 2003 incumbent SF 278, a 2004 incumbent SF 278, a 2005 nominee SF 278, a 2005 incumbent SF 278, and a 2005 termination SF 278. CRAWFORD signed all six SF 278s, certified that they were complete and correct, and caused them to be filed with the Department of Health and Human Services ("HHS") ethics officials, who were located in

Washington, D.C.

7. Each year, HHS ethics officials reviewed CRAWFORD's SF 278s to ensure that he and his wife were not holding stocks or stock options of companies that were "significantly regulated organizations," which federal regulations defined as organizations "for which the sales of products regulated by the [FDA] constitute ten percent or more of annual gross sales in the organization's previous fiscal year[.]" 5 C.F.R. § 5501.101(c)(2). Any FDA employee who was required to file an SF 278 could not hold a "financial interest," such as stock or stock options, in a significantly regulated organization. Each year, HHS published a publicly available list of significantly regulated organizations in what was colloquially referred to as the "Yellow Book."

8. CRAWFORD's nomination as Commissioner required confirmation by the United States Senate, and was considered by the Senate Committee on Health, Education, Labor, and Pensions (the "Senate Committee"), which was located in the Dirksen Senate Office Building, in Washington, D.C.

9. As a nominee, CRAWFORD was required to submit two financial disclosure documents to the Senate Committee. The first was a nominee SF 278. On February 23, 2005, CRAWFORD signed this nominee SF 278, certified that it was complete and correct, and caused it to be transmitted to the Senate Committee. The second was a Statement for Completion by Presidential Nominees (the "Statement"). Among other things, the Statement required CRAWFORD to list his sources of income received during 2002, 2003, and 2004, and to list the names of corporations in which he possessed stock options. On February 25, 2005, CRAWFORD signed the Statement, certified, under oath, that it was complete and correct, and caused it to be filed with the Senate Committee.

### CRAWFORD's Retention of Stocks in Significantly Regulated Organizations

10. CRAWFORD and his wife maintained brokerage accounts that were managed by a broker who had the authority to and did engage in stock transactions without first consulting with the Crawfords. CRAWFORD and his wife retained the authority to order the broker to engage in specific sales and purchases and to avoid certain stocks entirely. After every stock transaction, CRAWFORD and his wife received notice of the transaction at their home. Every month, CRAWFORD and his wife also received brokerage statements indicating the sales and purchases that had occurred, the amount and source of any dividends they had received, and the number of shares and value of all of the stocks that they owned.

11. In January 2002, shortly before assuming office as Deputy Commissioner, CRAWFORD filed his 2002 new entrant SF 278 with HHS ethics officials. In that filing, CRAWFORD declared that he and/or his wife owned stock in the following significantly regulated organizations: Abbott Labs; American Home Products; Boston Scientific; Johnson & Johnson; Kimberly-Clark; Medtronic; Merck; Merrill Lynch Biotech Holdings; Pepsico; Pfizer; Sysco Corporation; and Waters Corporation. HHS ethics officials advised CRAWFORD that he and his wife had to sell all of these stocks. CRAWFORD and his wife subsequently sold their shares in all of these entities, with the exception of Kimberly-Clark, Pepsico, and Sysco, in which they each retained stock. CRAWFORD's wife also retained stock in Wal-Mart, another significantly regulated organization, but one which CRAWFORD did not disclose on his 2002 new entrant SF 278.

12. Throughout 2003 and continuing during his tenure at the FDA, CRAWFORD and his wife continuously held publicly traded stocks in these significantly regulated organizations:

a) From January 2003 through June 2004, the Crawfords owned 1,400 shares of Pepsico stock (some in CRAWFORD's name, some in his wife's name), with a value ranging from about $53,000 to about $76,000. The Crawfords sold all of their Pepsico stock on July 7, 2004;

b) From January 2003 through April 2003, the Crawfords owned 2,300 shares of Sysco stock (some in CRAWFORD's name, some in his wife's name); from May 2003 through September 2004, they owned 2,500 shares; from October 2004 through August 2005, CRAWFORD's wife owned 1,500 shares. The value of their holdings ranged from about $48,000 to about $99,000. CRAWFORD sold all of his Sysco stock on October 25, 2004; his wife sold all of her Sysco stock on August 31, 2005;

c) From January 2003 through January 2004, the Crawfords owned 1,250 shares of Kimberly-Clark stock (some in CRAWFORD's name, some in his wife's name); from February 2004 through September 2004, they owned 1,350 shares; from October 2004 through July 2005, they owned 1,050 shares. The value of their holdings ranged from about $56,000 to about $90,000. The Crawfords sold all of their Kimberly-Clark stock on August 18, 2005; and

d) From January 2003 through February 2003, the Crawfords owned 650 shares of Wal-Mart stock (some in CRAWFORD's name, some in his wife's name); from March 2003 through April 2003, they owned 900 shares; from May 2003 through December 2004, they owned 1,200 shares. The value of their holdings ranged from about $31,000 to about $71,000. The Crawfords sold all of their Wal-Mart stock on January 4, 2005.

13. Throughout 2003 and continuing during his tenure at the FDA, CRAWFORD and/or his wife earned about $1,600 in dividends from Pepsico; $3,000 in dividends from Sysco; $5,000 in dividends from Kimberly-Clark; and about $1,000 in dividends from Wal-Mart.

CRAWFORD's Retention and Exercise of Stock Options
in a Significantly Regulated Organization

14. While serving as Deputy Commissioner, Acting Commissioner, and Commissioner, CRAWFORD retained stock options in Embrex Corporation, another significantly regulated organization. From 1993 through February 2002, prior to his tenure at the FDA, CRAWFORD had served as a member of the board of directors of Embrex Corporation. As compensation for his service, he had periodically received stock options. Most of these options expired ten years after they were issued. At the time that CRAWFORD became Deputy Commissioner, he held options to purchase 41,500 shares of Embrex stock.

15. On January 28, 2003, CRAWFORD's option to purchase 2,500 shares of Embrex stock expired without CRAWFORD taking action.

16. On October 28, 2003, three weeks before the option was due to expire, CRAWFORD exercised an option to purchase 2,000 shares of Embrex stock. CRAWFORD retained these 2,000 shares for the rest of his tenure at the FDA. From this transaction, CRAWFORD earned $8,150.00, which he correctly reported on his 2003 tax return as ordinary income.

17. On November 16, 2004, CRAWFORD's option to purchase 4,000 shares of Embrex stock expired without CRAWFORD taking action.

18. On November 17, 2004, the day the option was due to expire, CRAWFORD exercised an option to purchase 3,000 shares of Embrex stock. CRAWFORD sold the shares on the same day that he purchased them. From this transaction, CRAWFORD earned $20,627.36, which he correctly reported on his 2004 tax return as ordinary income.

19.     Other than the options to purchase 5,000 shares of Embrex stock that CRAWFORD exercised in 2003 and 2004 and the options to purchase 6,500 shares of Embrex stock that expired in 2003 and 2004, CRAWFORD retained the remainder of his Embrex stock options for the duration of his tenure at the FDA.

### CRAWFORD's False Writings

20. On or about the dates set forth below, CRAWFORD made the following false writings, all of which contained statements that CRAWFORD knew to be materially false:

a) On July 1, 2004, CRAWFORD filed his 2004 incumbent SF 278 (covering calendar year 2003) with HHS ethics officials. In this SF 278, CRAWFORD disclosed ownership of Sysco and Kimberly-Clark stock. An HHS ethics official inquired about CRAWFORD's ownership of stock in these significantly regulated organizations. On or about December 28, 2004, in an email to the HHS ethics official, CRAWFORD stated, "Sysco and Kimberly-Clark have in fact been sold." In truth and in fact, as CRAWFORD then knew, CRAWFORD and/or his wife held shares in both Sysco and Kimberly-Clark throughout 2003 and 2004;

b) In this same SF 278, CRAWFORD did not disclose his income from the October 28, 2003 exercise of Embrex stock options, notwithstanding Schedule A's requirement to disclose all sources of earned income exceeding $200. Nevertheless, CRAWFORD signed this SF 278, certifying that it was "true, complete and correct to the best of [his] knowledge." In truth and in fact, as CRAWFORD then knew, he had earned $8,150.00 in income from the exercise of the Embrex stock options;

c) On February 23, 2005, CRAWFORD filed his 2005 nominee SF 278 (covering calendar year 2004 through the date of filing) with HHS ethics officials, who transmitted it to the

Senate Committee. Schedule A of this SF 278 required CRAWFORD to disclose his sources of earned income exceeding $200 and all investment assets having a value exceeding $1,000. CRAWFORD did not disclose his income from the November 17, 2004 exercise of Embrex stock options or the Crawfords' ownership of Kimberly-Clark or Sysco stock. Nevertheless, CRAWFORD signed this SF 278, certifying that it was "true, complete and correct to the best of [his] knowledge." In truth and in fact, as CRAWFORD then knew, CRAWFORD had earned $20,627.36 in income in 2004 from the exercise of Embrex stock options and CRAWFORD and/or his wife owned a minimum of about $48,000 in Sysco stock and a minimum of about $62,000 in Kimberly-Clark stock during 2004; and

    d) On February 25, 2005, CRAWFORD submitted the Statement to the Senate Committee. The Statement required CRAWFORD to list his sources of income received during 2002, 2003, and 2004. CRAWFORD did not disclose his income from the exercise of Embrex stock options in October 2003 and November 2004. The Statement also required CRAWFORD to list the names of corporations "in which you have any financial interest through the ownership of stocks, stock options, bonds, partnership interests, or other securities, which you wish to retain during your period of government service[.]" CRAWFORD did not disclose his remaining Embrex stock options, instead responding, "None." Nevertheless, CRAWFORD signed this Statement, swearing that it was, to the best of his knowledge and belief, "current, accurate, and complete." In truth and in fact, as CRAWFORD then knew, CRAWFORD had earned $8,150.00 in income in 2003 and $20,627.36 in income in 2004 from the exercise of Embrex stock options, and, at the time that he submitted the Statement, he continued to hold options to purchase 30,000 shares of Embrex stock.

21.     On June 28, 2005, CRAWFORD filed his 2005 incumbent SF 278 (covering calendar year 2004) with HHS ethics officials. In this SF 278, CRAWFORD disclosed the fact that he and/or his wife had sold Kimberly-Clark, Pepsico, Sysco, Wal-Mart, and Embrex stock in 2004.

### Conflict of Interest

22.     On August 11, 2003, then-FDA Commissioner Mark McClellan established the Obesity Working Group ("OWG") to study the problem of obesity, and prepare a report recommending actions that should be taken. CRAWFORD was the Chairman of the OWG, which consisted of at least 17 members from the FDA. During its tenure, OWG members met eight times; received briefings from experts from other government agencies; solicited and received comments from the public, including consumer, health, and industry groups; and met with representatives from the packaged food and restaurant industries. The OWG formed specialized subgroups that studied particular issues and forwarded their analyses and conclusions to the OWG.

23.     On February 11, 2004, CRAWFORD and the OWG's Vice Chairman submitted the OWG's final report and recommendations, entitled "Calories Count: Report of the Working Group on Obesity," to Commissioner McClellan. The report contained many recommendations, including: issuing a notice of proposed rulemaking on how to give calories greater prominence on food labels; publishing a proposed rule providing guidance on the labeling of the carbohydrate content in food; and urging the restaurant industry to launch a nationwide, voluntary, nutrition information campaign for customers. The OWG encouraged manufacturers to relabel serving sizes, noting as an example that "a 20 oz bottle of soda that currently states 110 calories per

serving and 2.5 servings per bottle could be labeled as 275 calories per bottle." The FDA publicly released "Calories Count" on March 12, 2004.

24. On June 3, 2004, in Washington, D.C., CRAWFORD testified before the House of Representatives Committee on Government Reform at a hearing on the government's role in combating obesity. In his testimony, CRAWFORD outlined the OWG's recommendations, and again stressed the importance of relabeling serving sizes for sodas.

25. During the entire period from the formation of the OWG to the date of CRAWFORD's congressional testimony, CRAWFORD and his wife owned 1,400 shares of Pepsico stock, worth a minimum of about $62,000, and 2,500 shares of Sysco stock, worth a minimum of about $78,000. Pepsico, a leading manufacturer of soft drinks and snack foods, and its shareholders had a financial interest in the OWG's conclusions and recommendations. Sysco, a leading manufacturer of food products, and its shareholders had a financial interest in the OWG's conclusions and recommendations.

26. There is no evidence that the OWG's conclusions were altered because of the Crawfords' ownership of Pepsico or Sysco stock.

          JEFFREY A. TAYLOR
          United States Attorney

By: *Howard R. Sklamberg*
     HOWARD R. SKLAMBERG
     TIMOTHY G. LYNCH
     Assistant United States Attorneys

## DEFENDANT'S ACCEPTANCE

I have read every word of this Statement of Offenses. Pursuant to Fed. R. Crim. P. 11, after consulting with my attorney, I agree and stipulate to this Statement of Offenses, and declare under penalty of perjury that it is true and correct.

Date: 10·16·06

LESTER M. CRAWFORD
Defendant

I have discussed this Statement of Offenses with my client, Lester M. Crawford. I concur with his decision to stipulate to this Statement of Offenses.

Date: 10·16·06

BARBARA VAN GELDER, Esquire
Attorney for the Defendant

AMY F. DUNATHAN, Esquire
Attorney for the Defendant